## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SUSAN HENRY, for herself and on behalf of all others similarly situated, | Case No.  1:18-cv-01924-MN |
| *Plaintiff*, | |
| v. | FIRST AMENDED CLASS ACTION COMPLAINT |
| WOLVERINE WORLD WIDE, INC., a Delaware Corporation, WASTE MANAGEMENT OF MICHIGAN, INC., a Michigan Corporation; and THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., a Delaware Corporation, | DEMAND FOR JURY TRIAL |
| *Defendants*. | |

---

## FIRST AMENDED CLASS COMPLAINT WITH INDIVIDUAL CLAIMS AND DEMAND FOR JURY TRIAL

---

Plaintiff, Susan Henry, by and through counsel, hereby files this First Amended Class Action Complaint and Demand for Jury Trial, on behalf of herself and all others similarly situated, with individual claims, and alleges the following facts against Defendants:

### I. Toxic Chemicals found in Land and Water

1.      Defendant Wolverine Worldwide, Inc. ("Wolverine") has manufacturing and disposal facilities in Kent County, Michigan.

2.      For decades, unknown to Plaintiff or Class Members, Defendant The 3M Company ("3M") provided toxic chemicals to Wolverine for use and disposal in these facilities.

3.      Among these toxic chemicals were Per- and Poly-FluoroCarbons (collectively, "PFC's" or "fluorocarbons"), including per- and poly-fluoroalkyl substances ("PFAS's"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

4.      As 3M knew or should have known, Wolverine and its agent Waste Management of Michigan, Inc. ("Waste Management"), discharged sludge and debris containing these PFC's into the air, ground, and water – and provided these PFC's to others to discharge into the air, ground, and water – at a variety of locations in western and central Michigan, particularly in and around Kent County.

5.      The PFC's leached into ground water surrounding these sites, contaminating the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish and deer) living in or on them, and exposing Plaintiff and Class Members to dangerously high levels of PFC's, including PFAS's, PFOS, and PFOA.

6.      Defendants knew about this toxic waste contamination for years and concealed it from Plaintiff, Class Members, and the public.

7.      For years, Defendants did nothing to remediate this contamination while it spread throughout various locations in Michigan, particularly in and around Kent County.

8.      Recent water sampling in Kent County has revealed that the wells providing drinking water for many homes have toxic levels of PFC's, including PFAS's, further including PFOS and PFOA.

9.      This contamination is a result of Wolverine's dumping and disposal of tannery waste, including through Waste Management.

10.      As a result of this contamination, residents of the communities around Wolverine's facilities, including Plaintiff, Class Members, and the public, are directly affected by the water issue and are worried about it.

11.     Residents of the communities around Wolverine's facilities are directly affected by the water issue and are worried about it.

12.     Wolverine has admitted that residents of the communities around Wolverine's facilities "are directly affected by the water issue" and "are worried about it."

13.     Because of these discharges of toxic wastes, the persons and property of Plaintiff and Class Members have been materially damaged, in an amount to be determined at trial.

14.     In addition to damages, Plaintiff and Class Members are entitled to injunctive relief to remediate the toxic conditions alleged in this First Amended Complaint.

15.     3M manufactured PFOS and related molecules starting no later than 1948.

16.     3M invented Scotchgard™ and supplied it to Wolverine.

17.     Continuously from the time of its first manufacture until 2002, Scotchgard™ contained PFC's, including PFAS's such as PFOS and PFOA.

18.     3M continued to sell Scotchgard™ containing PFOA/PFOS until 2002.

19.     3M continued to sell Scotchgard™ containing PFC's, including PFAS's such as PFOS and PFOA, until 2002.

20.     Wolverine knew that PFOS/PFAS were in Scotchgard™.

21.     Wolverine knew that PFC's, including PFAS's such as PFOS and PFOA, were in Scotchgard™.

22.     For over four decades, 3M manufactured, marketed, and sold Scotchgard™ product containing PFOA/PFOS to the public.

23.     For decades, 3M repeatedly assured Plaintiff, Class Members, and the public that Scotchgard™ and products containing Scotchgard™ were safe.

24.     3M repeatedly assured Wolverine and the public that there are no adverse effects on human health or the environment from Scotchgard™.

25.     Upon information and belief, 3M continued to assure Plaintiff, Class Members, and the public that there are no adverse health effects associated with the PFOA/PFOS compounds in its discontinued Scotchgard™ product until at least as recently as December, 2017.

26.     Upon information and belief, as recently as December, 2017, 3M continued to assure Plaintiff, Class Members, and the public that "PFOS and PFOA do not present health risks at levels they are typically found in the environment or in human blood" and that even "production workers who were exposed to these chemicals at levels significantly higher than those in the general population – often over an extended period of time . . . show no adverse health effects."

27.     All of these assurances by 3M are false, were false when made, and 3M knew they were false when it made them.

28.     For decades, Wolverine repeatedly but falsely assured Plaintiff and Class Members that its tannery and manufacturing wastes were safe.

29.     As recently as this year – by which time, after decades of secrecy, the information in this First Amended Complaint has become publicly available – Wolverine still assured Plaintiff, Class Members, and the public that "the science is not conclusive," and further assures them that "many of the allegations made by plaintiffs' attorneys in the state court lawsuits are misleading and simply not supported by the facts.  There is no imminent danger to the health of anyone involved in these lawsuits."

30.     As recently as November 14, 2017, Wolverine assured Plaintiff, Class Members, and the public that "soil that has been amended with liquid tannery byproducts poses no health

impacts to humans or animals, including vegetation that may have been grown in this type of soil."

31.     Wolverine also assured Plaintiff, Class Members, and the public that there is no health risk from swimming or recreational contact with water from its former tannery site, the Rogue River, or Rum Creek.

32.     These assertions by Wolverine are false, were false when made, and upon information and belief, Wolverine knew they were false when it made them.

33.     However, on May 22, 2018, while continuing to deny its responsibility for the chrome, arsenic, and other toxic chemicals found in Rogue River sediment, Wolverine finally conceded that its PFC's might actually pose a threat to area groundwater, heath, and/or the environment.

34.     Specifically, Wolverine stated in its blog to area residents and property owners, including Plaintiff and Class Members, that "with the exception of PFAS compounds, tannery waste does not pose a threat to area groundwater, health or the environment."

35.     Wolverine also assured Plaintiff and Class Members that "we want residents to know what we know."

36.     Except for the carve-out regarding the dangers of PFAS compounds (which are, in fact, dangerous), these statements by Wolverine are also false, were false when made, and Wolverine knew they were false when it made them.

37.     Even with the exception of PFAS compounds, tannery waste does pose a threat to area groundwater, health or the environment.

38.     Wolverine does not actually want residents to know what it knows.

39.     Wolverine never wanted residents, Plaintiff, or Class Members to know what it knows and instead took active measures to conceal the facts alleged in this First Amended Complaint from them.

40.     Wolverine operated a tannery in downtown Rockford for over 100 years, until closing it in 2009.

41.     In addition to the tannery, Wolverine operated a factory, waste-water treatment facility and pumping plant, and had maintenance and other buildings on the tannery site.

42.     After closing the tannery, Wolverine demolished most or all the buildings on the site.

43.     This was done in part to conceal the improper actions and inactions of Wolverine alleged in this First Amended Complaint.

44.     However, demolition of the maintenance building revealed the pit underneath it, where toxic wastes were dumped.

45.     At times, so much toxic waste was dumped into the pit under the building that it overflowed.

46.     From the late 1950's until about 2002, Wolverine used 3M's Scotchgard$^{TM}$ at its Rockford site in the production of certain leather footwear products.

47.     Wolverine used PFC-containing materials, including Scotchgard$^{TM}$, at its Rockford site starting no later than 1958, the year it launched its iconic Hush Puppies brand.

48.     3M has known since at least 1970 that PFC's, including PFAS's such as PFOS and PFOA, are extremely toxic and cannot safely be released into the environment.

49.     No later than 1970, 3M knew that PFC's, including PFAS's such as PFOS and PFOA, are toxic, stable, persistent in the environment, and do not degrade.

50.     A 1970 study in 3M's files shows a lethal dose of PFC for fish of just 1 part per million; that was the lowest concentration tested, but even at that low level, fish could not swim upright and died within weeks of being exposed to PFC's.  At 4 ppm, fish died within days; at 12.5 parts per million, the fish died within hours; and at 125 parts per million, the fish died within as little as 5 minutes.

51.     In 1978, 3M's Central Analytical Laboratory conducted a study of PFC toxicity in Rhesus monkeys.  Every one of them died.

52.     Later that same year, 3M's Central Analytical Laboratory repeated the experiment at lower doses of PFC.

53.     At PFC doses as low as 4.5 parts per million, every monkey still died.

54.     In 1983, PFC levels in some 3M workers' blood was found to have been increased.

55.     That trend was viewed with serious concern by 3M.

56.     In 3M's own words, "we must view this present trend with serious concern."

57.     Nevertheless, despite knowing the toxic and accumulative nature of its PFC-containing products, 3M hid all of these studies from Plaintiff and Class Members.

58.     These levels of toxins are not just found inside 3M's Central Analytical Laboratory.

59.     Because PFC's are bio-accumulative (*i.e.*, they do not break down and are excreted less rapidly than they are consumed), consumption of relatively lower levels of PFC-contaminated water results in much higher levels of PFC's in the blood.

60.     For example, 3-year old Jack McNaughton lives on Chandler Drive NE, about 800 yards south of Wolverine's House Street Dump, described in more detail below.  His family gets their water from a private well, as do all of the residents of Chandler Drive.

61.     In September, 2017, as a result of Defendants' misconduct, PFAS levels in the McNaughtons' water were approximately 5,000 parts per trillion ("ppt") – 70 times the Michigan and U.S. EPA safe limits.

62.     Jack McNaughton's blood, however, had PFAS levels of 484,000 ppt – approximately 484 parts per billion or 0.5 parts per million, dangerously close to the lethal dose of PFC's that 3M administered to its Rhesus monkeys, and 50% of the lowest tested dose in the fish experiment, which still killed the fish and prevented them from being able to swim normally.

63.     It is not just short-term toxicity that is dangerous about PFC's; they cause longer-term illnesses, as well.

64.     For example, Sandy Wynn-Stelt lives across the street from Wolverine's House Street Dump.  Like the McNaughtons, Ms. Wynn-Stelt gets her water from a private well, as do all of the residents of House Street.

65.     As a result of Defendants' misconduct, total PFAS in her drinking water well was more than 49,000 parts-per-trillion in August, 2017.

66.     Her late husband, Joel Stelt, died of liver cancer in 2016, caused by Mr. Stelt's drinking for years water that Defendants had caused to be contaminated with PFC's.

67.     Mr. Stelt's blood was not tested for PFC's because at the time, no-one outside of Defendants knew about the PFC contamination.

68.     Fluorocarbons, such as PFOS, are stable molecules and therefore persistent.  As such, fluorochemicals including PFOS have the potential to accumulate in the body with repeated exposures and to resist degradation in the environment.

69.     PFC's, such as PFAS's, including PFOS and PFOA, do not break down into non-PFC's in the environment.  As a result, they are persistent when released into soil or water. Because they are water-soluble, they are also mobile and do not remain where they were released.

70.     PFC's such as PFAS's, including PFOS and PFOA, can remain in the environment for years and move through air, soil and through and into ground-water and other bodies of water, such as rivers, lakes, streams, aquifers, etc.

71.     PFC's such as PFAS's, including PFOS and PFOA, leach through the soil and are mobile in the environment, such that they pollute ground- and surface-water and the surrounding environment.  Their vapors are also carried in the air, causing widespread contamination and public health issues from inhalation.

72.     Human and animal exposure to PFC's such as PFAS's, including PFOS and PFOA, leads to build-up of these substances in the body ("bio-accumulation"), particularly in the blood, kidney, and liver.

73.     PFC's such as PFAS's, including PFOS and PFOA, have been found in eagle hatchlings in remote locations, whose only food source is fish caught in remote lakes by its parents.  3M knew this no later than March, 1999.

74.     Further, rather than merely passively standing by, 3M actively worked to conceal the facts alleged in this First Amended Complaint from Plaintiff and Class Members.

75.     One way 3M did this was by saying that PFC's had merely "been found in the blood of animals," while omitting the most significant information:  that the eaglets' contamination showed bioaccumulation to an alarming degree.

76.     PFC's such as PFAS's, including PFOS and PFOA, cause a wide variety of illnesses, including: cancer (further including kidney and testicular cancer); thyroid disease; ulcerative colitis; high cholesterol and low LDL-cholesterol, which in turn cause cardiovascular and circulatory events; and pregnancy-induced hypertension.

77.     Nevertheless, for decades, 3M included PFC's such as PFOA, PFOS, and related PFAS's, as part of its popular Scotchgard$^{TM}$ product.

78.     For decades, Wolverine and Waste Management dumped the toxic chemicals provided by 3M, including PFC's, further including PFAS's, further including PFOA and PFOS, into the ground and water in various locations throughout Michigan, often (but not exclusively) in Kent County.

79.     These PFC's, further including PFAS's, further including PFOA and PFOS, then migrated to other water resources throughout Kent County, including the Rogue river, Rum creed, private wells and popular fishing spots.

80.     For decades, 3M did not tell Wolverine, its other customers, or Plaintiff or Class Members, that the chemicals it was providing were toxic.

81.     3M conducted medical surveillance among employees occupationally exposed to PFOS for over twenty years.

82.     3M's medical surveillance of its employees began no later than the late 1970's.

83.     In at least 1999, 3M told Wolverine that "No adverse health effect associated with PFOS exposure has been found in 3M employees."

84.     This assertion by 3M is false and was false when made.

85.     When 3M made this assertion, 3M knew that it was false.

86.     3M knew that this assertion was false when made because, among other things, a few years before making this statement, 3M had conducted a study of workers at its facility in Cottage Grove, Minnesota, and found that workers with ten or more years' exposure to PFC's had a statistically-significant, three-fold elevation in death rates from prostate cancer.

87.     3M also told its customers, including Wolverine, that there is an "absence of known human health effects at the levels observed . . . [from] PFOS."

88.     This assertion by 3M is false and was false when made.

89.     When 3M made this assertion, 3M knew that it was false.

90.     3M knew that this assertion was false because, among other things, a few years before making this statement, 3M had conducted a study of workers at its facility in Cottage Grove, Minnesota, and found that workers with ten or more years' exposure to PFC's had a statistically-significantly, three-fold elevation in death rates from prostate cancer.

91.     3M also told its customers, including Wolverine, that "We are committed to keeping our customers fully informed . . . ."

92.     This assertion is false and was false when made.

93.     When 3M made this assertion, 3M knew that it was false.

94.     3M knew that this assertion was false because, among other things, far from being "committed to keeping our customers fully informed," 3M deliberately hid the damaging nature of PFC's from Plaintiff and Class Members for years, from at least 1958 through 2017.

95.     One way 3M did this was by, for example, instructing its employees not to create paper trails regarding PFC issues.

96.    For example, 3M employee Rich Purdy explained on March 28, 1999, that "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on [these] issues . . . ."

97.    On September 2, 1998, 3M also told its employee Lisa A. Clemen to "dispose of this work" relating to PFC's and to "clean out computer of all electronic data" relating to PFC's.

98.    Ms. Clemens' notes from May, 1998, also indicate that 3M had "3 major products containing fluorochemicals[:]  1) coating on packaging – grease resistant  2)  Scotchgard  3)  Triple-F – firefighting foam."

99.    3M had 3 major products containing fluorocarbons, one of which was Scotchgard$^{TM}$.

100.    Another example of 3M's active concealment of the toxic nature of its Scotchgard$^{TM}$ product is that one of 3M's consultants on Scotchgard$^{TM}$ science, John Giesy at Michigan State University ("MSU"), explained to 3M on March 26, 2008, that he listed his work for 3M on time sheets "as literature searches so that there was no paper trail to 3M."

101.    Dr. Giesy used his AOL account, rather than his MSU e-mail account, to communicate with 3M, about his work in, as he put it, "keep[ing] bad papers out of the literature."

102.    About half of the papers published in the area in any given year came to Dr. Giesy for review.

103.    3M paid Dr. Giesy over a million dollars for his work in keeping the truth about PFC's out of the scientific literature.

104.    PFC's, including PFAS's, further including PFOS and PFOA, are persistent, toxic, water-soluble, and bio-accumulative.

105.     PFC's are toxic chemicals that persist for centuries or millennia unless disposed of in an incinerator at temperatures well in excess of 1,000º F.

106.     Prior to claiming it ceased manufacturing PFC's in 2002, 3M had known for years that PFC's are toxic chemicals, which, due to the stable nature of the carbon-fluorine bond, persist for centuries or millennia, unless disposed of in an incinerator at temperatures above 1,000º F.

107.     Prior to claiming it ceased manufacturing PFC's in 2002, 3M had known for years that PFC's, including PFAS's, further including PFOS and PFOA, are persistent, toxic, water-soluble, and bio-accumulative.

108.     In fact, 3M's own employees knew that 3M's competitors (including one based in Kalamazoo, Michigan) incinerated their wet waste and, as far back as 1962, 3M's own employees recommended 3M do the same thing so that "wet waste material will not have an opportunity to seep into the soil."

109.     However, upon information and belief, 3M did not make that same recommendation to Wolverine.

110.     Instead, upon information and belief, 3M hid its own Geology Department's recommendations from Wolverine.

111.     3M did this because, in its own words, "PRIMARILY BECAUSE OF THE PERSISTENCE OF FLUORO-CHEMICALS, ENVIRONMENTAL, HEALTH, SAFETY AND REGULATORY ISSUES AND TRENDS THREATEN TO LIMIT OUR BUSINESS."

112.     Currently, more testing is underway and additional areas of contamination are still being identified.  Due to the persistent and dispersive nature of PFC's, including PFAS's, further including PFOS and PFOA, the contamination is extremely widespread.

113.     Plaintiff and Class Members are afraid, having learned that toxic PFC's, including PFAS's, further including PFOS and PFOA chemicals (from Wolverine's tannery waste) leached into the ground and water, including into their drinking supplies.

114.     Wolverine treated its leather products with the PFOS-based product Scotchgard$^{TM}$, which is manufactured by 3M.

115.     Wolverine, with no concern with the health effects its dumping would later cause, then dumped its tannery waste into the ground and water without adequate – or any – safeguards against environmental contamination.

116.     The dumping occurred at locations scattered throughout central and western Michigan, primarily in Kent County.

117.     For example, in a wooded area just west of US-131 and south of 10 Mile Road in Belmont, decaying metal barrels, scraps of old, rotting leather, and other toxic tannery waste have become enmeshed with the wilderness in an area of the countryside littered with debris that has been dubbed "Leather Hill" by local residents.

118.     "Leather Hill" is a former Wolverine waste disposal facility or landfill, located at 1855 House Street NE in Belmont.  It is also known as House Street Dump.

119.     Defendants have been aware of the contamination for years and have failed to prevent toxic materials from leaching into ground water at the locations where waste from their products was disposed of.

### *House Street Disposal Area and Southeast Expansion Area*

120.     MDEQ had Wolverine conduct water testing and requested samples of 21 residences to the west and south of the dumping site and 4 residences at the corner of Chandler Drive NE and Herrington Avenue NE; the sampling later extended to 28 parcels.  This initially-discovered zone of contamination is known as the House Street site.

121.    PFC's were present in private wells and in a municipal water supply.

122.    On September 8, 2017, the Kent County Health Department issued a News Release alerting the citizens that "toxic" chemicals had been found in Belmont well water.

123.    Plaintiff had no way of knowing about Defendants' actions until that time.

124.    In September of 2017, additional samples were taken to help determine the extent of contamination.

125.    On October 18, 2017, MDEQ expanded testing of private drinking water wells located to the southeast of the current House Street Disposal Area, known as the "Southeast Expansion Area."  Southeast Expansion area includes an additional 300 homes.

126.    Since the initial identification of the contamination, new areas of contamination have been and are being identified, including over 75 disposal sites located in Kent County, which threaten the health, quality of water supply, and property values of Plaintiff and Class Members, who are horrified to learn that they have been exposed to toxic chemicals by Defendants' misconduct.

127.    Defendants also knew that PFOA and PFOS were highly soluble and mobile in water, highly likely to contaminate water supplies and other sensitive receptors, were persistent in the environment, and would bio-accumulate in humans and cause serious health effects.

128.    Defendants did not care and ignored the damage that doing this would cause.

129.    Defendants marketed and sold their products with knowledge that large quantities of Scotchguard$^{TM}$, containing toxic PFC's, would be used in Michigan, in a way that PFAS's, including PFOA and PFOS, would contaminate the air, soil and groundwater.

130.    3M marketed and sold its products with knowledge that large quantities of its chemicals, containing toxic PFC's, would be stored, used, and disposed of at Wolverine's

tannery sites and wherever else Wolverine disposed of the waste, and that such systems and storage were used and maintained in such a manner that dangerous chemicals were being released into the air, soil, water, and groundwater.

131.    Defendants failed in their duty to warn Plaintiff and Class Members of the inherently dangerous properties of their chemicals.

132.    Additionally, Plaintiff, Class Members, and residents had no idea they were being exposed to PFC's, including PFAS's, further including PFOS and PFOA, at toxic concentrations above the safe drinking water level.

133.    Plaintiff, Class Members, and residents did not know they were drinking water contaminated with PFC's, including PFAS's, further including PFOS and PFOA until this fact was disclosed to them by state officials.

134.    This exposure to PFC's puts them at significant risk of developing serious health conditions in the future, requiring that they know the levels of PFC's in their bodies and to which they have been exposed.

135.    Plaintiff brings this action against Defendants for relief from her exposure to toxic chemicals and contamination of ground and water in and near her property.

### Health Effects of PFOS and PFOA Exposure

136.    In May, 2016, the EPA established Lifetime Health Advisories ("LTHA") for both PFOS and PFOA. The LTHA set a level of PFOS and PFOA in drinking water to a combined concentration of 0.07 ppb or 70 ppt.

137.    Many parties have studied PFOA, including a Science Panel, also known as C-8, formed out of a class action settlement arising from contamination from DuPont's Washington Works, located in Wood County, West Virginia.

138.    The C8 panel included epidemiologists.  In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

139.    Health effects of PFOS are at least as bad as those of PFOA.

140.    In the May, 2015, "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFOSs)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[1]

141.    The USEPA has set a Health Advisory and Health Effects limit of 70 parts per trillion ("ppt") for PFOA and PFOS.

142.    Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

143.    University studies put the safety threshold for PFAS exposure significantly lower than the EPA's suggested safe level.

144.    For example, researchers at Harvard's School of Public Health and University of Massachusetts-Lowell said in 2015 that no contamination level higher than 1 ppt is safe for PFOA in drinking water.

---

[1] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFOS's). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

145.    California has noticed its intent to list PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

146.    Michigan currently follows the USEPA level of 70 ppt for combined PFOA and PFOS levels.

### The Putative Classes' and Plaintiff's Exposure and Damages

147.    Plaintiff and Class Members have been injured as a result of receiving water with elevated levels of PFC's, including PFAS's, further including PFOA and PFOS.

148.    For years, as a result of Defendants' misconduct, extremely high levels of toxic PFC's are in groundwater at Wolverine World Wide's former tannery property and in the Rogue River, both north and south of Rockford.

149.    For example, as recently as November, 2017, one spot on the site of the former tannery (which is adjacent to downtown Rockford) had 490,000 parts-per-trillion (ppt) combined PFOA/PFOS levels.

150.    That is over 5,000 times the USEPA level of 70 ppt for combined PFOA and PFOS levels.

151.    It is also approximately 0.5 ppm, the same level that was lethal to fish and dangerously close to the 4.5 ppm dose of PFC's that killed the monkeys in 3M's experiments.

152.    These results also included pore water sediment samples taken from the Rogue River and Rum Creek, which found PFAS at 12,400 ppt.

153.    That is 177 times the USEPA level of 70 ppt for combined PFOA and PFOS levels.

154.    Plaintiff and the Putative Classes have suffered exposure, personal injury, bioaccumulation of PFCs in their blood which causes known cancers and diseases, property damage, and the diminution of property value as a result of the PFC contamination caused by Defendants, including of drinking water supplies.

155.    As a result of years of consuming contaminated water, Plaintiff and the Putative Classes have been unknowingly exposed for many years to PFC's at concentrations toxic to their health through both ingestion and dermal absorption of PFOA and PFOS.

156.    The properties of Plaintiff and Class Members have been damaged as a result of the presence of PFC's in their homes, their soil, surrounding properties, potable water supply, and in nearby outdoor recreational amenities, such as the Rogue River.

157.    Further damage has been caused to Plaintiff and Class Members by the damage to sport-fishing in the area.

158.    There are extremely high levels of PFC's, in Rogue River foam below the Rockford Dam, a popular fishing spot in northern Kent County.

159.    State and local health officials have warned residents and the public not to ingest the foam.

160.    In addition, the State of Michigan has warned its citizens to eat no more than one or two serving per month of certain species of fish, caught in the Rogue River above the Rockford Dam or in Lake Freska, in Plainfield Township, because of PFC and mercury contamination.

161.    This contamination was caused by Defendants' culpable misconduct.

162.    Additional testing is planned.

163.    Wolverine's former tannery site sits alongside the Rogue River just upstream of, and north of, the dam.

164.    Total PFAS in a foam sample collected near the dam on April, 2018, were 296,584 parts-per-trillion (ppt), according to data collected by state contractors and publicly disclosed on Tuesday, June 5, 2018.

165.    These shockingly high levels prompted a warning from state and local health officials to avoid ingesting the foam, which tested at 4,200 times the federal advisory level for PFAS in drinking water.

166.    The foam is downstream of the former Wolverine World Wide tannery site in Rockford, where extremely high PFAS levels are also confirmed in shallow groundwater just steps from the riverbank.

167.    Wolverine used PFAS-laden 3M Scotchgard$^{TM}$ for decades at the tannery to waterproof leather for shoes.

168.    These high PFC levels are the result of Defendants' culpable conduct.

169.    Wolverine and Waste Management disposed of Wolverine's tannery and manufacturing waste at various places in and around Kent County and other parts of Michigan, including, but not limited to, land and water in or near the following:

   a)  House Street Dump, an unlined dump located at 1855 House Street NE in Belmont, just west of Route 131;

   b)  additional sites on House Street, including but not limited to 1758 House Street, also known as "Barrel Valley";

c)  State Disposal Landfill, located at 3954 East Beltline Ave. NE in Plainfield Township, controlled by Waste Management;

d)  the former Northeast Gravel Co. ("Northeast Gravel") gravel pit in southeast Plainfield Township, which has been redeveloped into the Boulder Creek Golf Club;

e)  the North Kent Landfill, f/k/a the 10 Mile Landfill and the Kent County Landfill, at 2908 10 Mile Road, just east of Route 130, where Wolverine dumped 20 to 25 tons of sludge per day, paying only $15.20 per ton;

f)  Butterworth Landfill, at 1450 Butterworth St. SW, in Grand Rapids;

g)  Central Landfill (aka Central Sanitary Landfill), at or near 21545 Cannonsville Drive, in Pierson Township, Montcalm County;

h)  Granger Grand River Landfill in Clinton County, near Lansing;

i)  8615 9 Mile Road NE, between 9 Mile and 10 Mile roads, half a mile northeast of East Rockford Middle School;

j)  a gravel pit on a farm southwest of Wolven Ave. and 11 Mile Road NE;

k)  the Wellington Ridge and 43 North developments, including but not limited to Hopewell Drive;

l)  an area from the vicinity of White Pine Trail at 4400 12 Mile Road NE, in Algoma Township;

m)  the vicinity of White Pine Trail near Wolverine's tannery site;

n) Rezen Drive, Rezen Court NE, and two private drives off Childsdale NE in Plainfield Township and Royal Hannah Drive NE, in Rockford, MI;

o)  a farm near 14 Mile Road and Northland Drive NE;

p)  the Hardy farm at 8431 Jewell Ave NE; and

q)  the Rogue River and Rum Creek, where toxic waste, sludge, and debris from the tannery were deposited and discharged.

170.    None of these sites was maintained properly to prevent contaminating the environment and exposing Plaintiff's and Class Members' persons and property to 3M's and Wolverine's toxic chemicals, including PFC's.

171.    A significant amount of contamination is found in an area comprising both sides of Route 131, approximately between Grand River, to the south, and 13 Mile Road to the north.  Northland Drive and Wolverine Blvd. (until its course alters westward just north of Boulder Creek Golf Club, which is part of the area) form an approximate eastern boundary to this area, while Pine Island Drive forms an approximate western boundary.

172.    In at least the cases of the farms, including the gravel pit on a farm southwest of Wolven Ave., Wolverine provided its toxic PFC-containing sludge, sometimes mixed with foundry sand, to be spread on the farms' fields to "amend" the soil (by changing the soil's pH) and which was dumped directly onto the soil without any containment or remediation.

173.    This waste was not contained in any way and was rototilled into topsoil.

174.    As a result, it has dispersed more rapidly than the waste in the dumps and caused astoundingly high levels of contamination.

175.    For example, just south of 11 Mile Road, the Klekotkas live in the Wellington Ridge neighborhood, where fields were "amended" with PFC-containing toxic sludge prior to being developed for residential use.

176.    The Klekotkas get their water from a private well.

177.    For years, Defendants' misconduct has caused this well to be contaminated by shockingly high concentrations of PFC's.

178.    A previous owner of the Klekotkas' house lived there for years and died of cancer in 2003, caused by exposure to high concentrations of PFC's for years.

179.    In early 2018, testing for the Klekotkas' well revealed PFC concentrations of 61,450 ppt – higher than in groundwater at the House Street Dump.

180.    While higher levels in groundwater and testing wells have been found (as set forth elsewhere in this First Amended Complaint), this is the highest known level of PFC contamination of drinking water in the United States.

181.    While higher levels in groundwater and testing wells have been found (as set forth elsewhere in this First Amended Complaint), this is the highest known level of PFC contamination of drinking water in the world.

182.    Testing of Wolverine's former tannery/factory site was conducted in 2017 and showed PFOS levels of 330,000 ppt and combined PFOS/PFOA levels of 490,000 ppt.

183.    This shockingly high concentration exists because Wolverine used to store its toxic materials, including PFC's, in drums outside of buildings at the tannery/factory site.

23

184.    As a result, any spills of these substances went directly into the ground and water, including groundwater.

185.    At House Street Dump and the Northeast Gravel gravel pit, tannery and manufacturing waste and sludge were dumped directly onto the ground, in unlined trenches.

186.    Between 2003 and 2009, over 300,000 gallons of leachate from Central Landfill were sent by truck to Wolverine's wastewater treatment plant at the tannery/factory site in Rockford.  That haul ranged from about 11,400 gallons-per-day (gpd) in 2003 to a peak of 24,700-gpd in 2006 – about one to two standard tanker truck loads per day.

187.    Wolverine's tannery accounted for about a third of Rockford's sewage flow to the city of Grand Rapids wastewater treatment plant prior to construction of the North Kent Sewer Authority sewage plant in Plainfield Township in 2008.  *Id.*

188.    Wolverine's wastewater treatment plant did nothing to filter or treat PFC's, including in the landfill leachate that was trucked back to it.

189.    Upon information and belief, Wolverine also dumped tannery and manufacturing waste directly into the Rogue River and Rum Creek, as shown by the presence of vast quantities of footwear debris in mud flats in the Rogue River, also referred to as "the Island of Lost Soles," and the presence of PFC's in the sediments of the Rogue River and Rum Creek

190.    Further, because many of these shoes, soles, and other footwear debris are branded "Hush Puppies," they are Wolverine's products and were dumped at least as recently as 1958, the year Hush Puppies were first marketed.  Upon information and belief, these shoes, soles, and other footwear debris were dumped at least as recently as the 1990's.

191.    Plaintiff and Class Members expect to identify additional sites and methods of discharge as investigation and discovery continue.

192.     Plaintiff and the Class Members were never informed of the hazards posed by Wolverine's PFC-contaminated waste until, at the earliest, August, 2017.  If Defendants had disclosed this contamination earlier, Plaintiff and Class Members would have curtailed their consumption of contaminated water and protected their families and children from exposure to such contamination, including in many instances, either not developing contaminated farmland into residential properties, or not purchasing those properties after the land had been developed.

193.     Wolverine also caused toxic levels of arsenic, total chromium, hexavalent chromium, copper, lead, mercury and zinc to leach into the Rogue River, diminishing the value of Plaintiff's and Class Members' property.

194.     Wolverine used chromium in bulk to convert raw hides into leather.

195.     Hexavalent chromium is a known carcinogen.

196.     Large amounts of toxic chemicals remain today in the vicinity of locations where these chemicals were dumped by Defendants.

197.     As a result of Defendants' disposal and failure to properly remediate toxic contamination, Plaintiff and Class Members are at risk of developing serious latent disease and other adverse medical conditions; and, as a result, are also suffering emotional distress.

198.     In addition, Plaintiff and Class Members must pay for monitoring both of their water and their bodies to ensure that they are not receiving additional contamination and so they can determine what remedial steps are needed.

199.     The ongoing presence of toxic chemical contaminants, including PFC's, has affected Plaintiff's and Class Members' properties and deprives Plaintiff and Class Members of their free use and enjoyment of their property.

200.    Plaintiff and Class Members have unknowingly been exposed to, and consumed, toxic chemical contaminants, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, at concentrations well above a safe level.

201.    Defendants deliberately concealed the information in this First Amended Complaint from Plaintiff and Class Members.

202.    This was particularly relevant in 2004, when new homes were approved for construction near the House Street Dump, and new wells were constructed to supply drinking water.  Those homes are now owned by Class Members, who would not have paid what they did for their homes, if they had known about the toxic chemical contamination of their, and nearby, wells, water, and land.

203.    From at least 1958-2009, Wolverine manufactured and sold products treated with (and often containing) toxic chemicals, such as PFC's, including PFAS, further including PFOA and PFOS; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, such as shoes and footwear, all at great financial benefit to itself.

204.    From at least 1958-2002, 3M manufactured and sold PFC-containing products, such as Scotchgard$^{TM}$ and Scotchgard$^{TM}$-containing products, at great financial benefit to itself.

205.    For many or all of the years that Wolverine used toxic chemicals in its manufacturing process, Waste Management continued to sell to Wolverine its inadequate disposal of those products, and waste from those products and from manufacture of those products, at great financial benefit to itself, Wolverine, and 3M – all of whom were much

more profitable than they would have been if any of them had borne the cost of preventing this pollution or remediating its effects after it occurred.

206.    Defendants continued to avoid the cost of environmental clean-up and lawsuits by failing to disclose the problem to Plaintiff and Class Members.

207.    Defendants failed to disclose the toxic nature of their manufacturing operations and products and waste.

208.    Defendants knew that these products were toxic and posed a risk to the environment and to human health, but failed to take any steps or corrective action or to notify Plaintiff or Class Members.

209.    Defendants knew that Plaintiff and Class Members relied on Defendants to properly dispose of their products and waste, especially toxic chemicals.

210.    Defendants knew that Plaintiff and Class Members relied on Defendants to properly maintain any toxic waste sites where they had disposed of contaminated waste and to notify Plaintiff and Class Members of any dangers and risks from that toxic waste.

211.    Plaintiff and Class Members could not have discovered Defendants' concealment and misconduct before September, 2017.

212.    Plaintiff and Class Members seek recovery from all Defendants for injuries, damages, and losses suffered by Plaintiff, who suffered injuries as a direct and proximate result of exposure of her person, property, and local amenities to toxic chemicals, and consumption of contaminated water from drinking water supplies, in an amount to be determined at trial, but in excess of $5 million, exclusive of interest, costs, and attorneys' fees.

213.    As a result of this contamination, Plaintiff and Class Members are anxious, worried, and fearful as to the health effects of these toxic chemicals on their persons and property.

214.    Plaintiff and Class Members bring this action for relief from exposure to toxic chemicals in their homes, other property, water supplies, waterways, and the environment, and the devaluation to the same caused by Defendants harmful and wrongful actions, defective products, and knowing concealment of the same.

## II. JURISDICTION AND VENUE

215.    Pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2), this Court has subject matter jurisdiction because this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different States.

216.    This Court has personal jurisdiction over Defendants because Defendants are incorporated in Delaware and reside in Delaware.

217.    Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because Defendants all reside in this District.

218.    This Court has supplemental jurisdiction over Plaintiff's State law claims under 28 U.S.C. § 1367.

## III. THE PARTIES

### Class Representative with Personal Injury and Property Damage Claims

219.    Plaintiff Susan Henry is a citizen of Michigan, who currently resides at 4035 Rector Ave. NE, Rockford, Michigan.  Plaintiff owns her home and has lived there for years.

220.    In 2018, Plaintiff learned that her property had lost value because of Defendants' misconduct alleged in this First Amended Complaint.

221.    Further, she is in fear that she has ingested dangerous chemicals, including PFC's, as a result of Defendants' misconduct, and needs continued blood testing and other medical monitoring.

### Defendants

222.    Each of the Defendants is responsible either negligently, intentionally, and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

223.    Defendant WOLVERINE WORLDWIDE, INC. ("Wolverine") is a Delaware corporation.

224.    Wolverine's headquarters are located at 9341 Courtland Drive, N.E., in Rockford, Michigan.

225.    Wolverine was founded in 1883 in Grand Rapids, Michigan, as Hurth-Krause Company.

226.    In 1903, Wolverine built its first factory in Rockford, Kent County, Michigan, shortly followed by a tannery on the same site, in 1908, that was used to supply the factory.

227.    Wolverine is, *inter alia*, a manufacturer and licensor of footwear products.

228.    Wolverine made tens or hundreds of millions of dollars in annual revenue from its PFC-treated products, including footwear, from 1958 until 2002.

229.    Defendant WASTE MANAGEMENT OF MICHIGAN, INC. ("Waste Management") is a Michigan corporation.

230.    Waste Management's headquarters are located at 48797 Alpha Drive, Suite 15, Wixom, MI 48393.  Waste Management may be served via its registered agent The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI 48170.

231.    Waste Management does business throughout the state of Michigan.

232.    Defendant THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., ("3M") is a Delaware corporation.

233.    3M's headquarters are located at 3M Center in St. Paul, Minnesota 55133.

234.    3M does business throughout the United States.

235.    3M made tens or hundreds of millions of dollars in annual revenue from its PFC-based products, including Scotchgard$^{TM}$, from 1958 until 2002.

236.    3M was aware of all of the facts alleged in this First Amended Complaint that pertain to 3M at the time that they occurred.

237.    3M never shared any of this information with Plaintiff, Class Members, or any residents of Kent County who were not employees of Defendants.

238.    3M knew, or should have known, that Wolverine disposed of, and would continue to dispose of, 3M-supplied PFC's in a way that caused the harms alleged in this First Amended Complaint, by dumping them in the ground and water in Michigan.

239.    One reason that 3M knew Wolverine would continue to do this is because, upon information and belief, for most or all of the years when PFC's were used, 3M had not told Wolverine about the toxic nature of 3M's products, even though 3M was well aware of the products' toxic nature.

240.    Instead, Defendants allowed new adverse effects to develop as PFC plumes expanded, contaminating more homes and drinking water resources and contaminating the air and environment.

241.    3M has also dumped PFC's into the ground on 3M property outside of Michigan.

242.    In at least one location, 3M knew that the St. Peter sandstone "is one of the aquifers in the Twin City area.  It is not used too extensively in the downtown metropolitan areas but is used to a large degree for shallow wells in the rural areas.  There are undoubtedly numerous wells in Cottage Grove, one mile to the south, which obtain their domestic water from the St. Peter sandstone."

243.    3M nevertheless dumped PFC's and other toxic waste into unlined open pits that drained into the St. Peter aquifer.

244.    There, toxic waste was "allowed to seep into the ground and as soon as one area becomes saturated, it will be covered over and another pit dug," despite the fact that 3M knew that the toxic waste would, in 3M's words, "reach the water table and pollute domestic wells."

245.    3M applied this same culpable approach to the safety of residents' drinking water to Plaintiff and the Class Members.

246.    Even back then, 3M knew what it was doing was wrong and sought to hide it from those who would be affected.

247.    In the words of a 3M memo written on July 13, 1960, by 3M employee John Brown, "Mr. Ryan is holding the papers on this property in his own name to minimize publicity.  . . . It is imperative that we have absolute freedom to use the land for dumping before purchase and use."

31

## IV. CLASS ACTION ALLEGATIONS

248.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

249.    As a result of Defendants' disposal and failure to properly remediate their PFC contamination, Plaintiff and Class Members are at risk of developing serious latent disease and other adverse medical conditions; and, as a result, are also suffering emotional distress.

250.    Plaintiff brings this action on her own behalf and on behalf of all other persons similarly situated, as Members of the proposed subclasses and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery, as follows:

a.      **Medical Monitoring Class**:  Individuals who consumed water that Defendants caused to be contaminated by PFC's and other toxic chemicals. ("Medical Monitoring Class").

b.      **Property Damage Class**: Individuals who own real property in or near areas that Defendants caused to be contaminated by PFC's and other toxic chemicals ("Property Damage Class").  This class can be readily ascertained by Census data, property records, and county records, along with proof of contaminated areas.

251.    Plaintiff is a Member of the proposed Classes that she seeks to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

252.    Excluded from the Classes are:

      i.      Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

32

  ii. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

  iii. Any class counsel or their immediate family members; and

  iv. All governmental entities.

253. Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity and Ascertainability

254. This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1), given that the number of affected individuals and property owners, upon information and belief, has reached the thousands, making individual joinder of Class Members' respective claims impracticable. While the exact number of Class Members is not yet known, a precise number can be ascertained from public records and other appropriate discovery. The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and the Court. It is expected that the Class Members will number in the thousands or tens of thousands.

255. Finally, Class Members can be notified of the pendency of this action by Court-approved notice methods.

### Typicality

256. Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiff's claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiff's person and real property, like that of all Class Members, has been damaged by Defendants' misconduct, in that she has incurred damages and losses related to the introduction of PFOA, PFOS, and other PFC's into the drinking water supplies as well as other outdoor recreational amenities in the area, causing personal injury and property damages.

257.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief that Plaintiff seeks is typical of the relief sought for absent Class Members.

### Adequacy of Representation

258.    Plaintiff will serve as a fair and adequate class representative as her interests, as well as the interests of her counsel, do not conflict with the interests of the absent Class Members whom they seek to represent.

259.    Further, Plaintiff has retained counsel who are competent and well experienced in class action and environmental tort litigation.

260.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor her counsel have interests adverse to the Class.

### Predominance of Common Issues

261.    There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3).  The answers to these common questions will advance resolution of the litigation as to all Class Members.  Common legal and factual issues include, but are not limited to:

i.      Whether Defendants engaged in the conduct alleged herein.

ii.     Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks.

iii.    Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users, Plaintiff, and the Class of same.

iv.     The extent to which Defendants knew about dangerous chemical contamination in the areas set forth in this First Amended Complaint.

v.   Whether the Defendants owed a duty to the Plaintiff and the Class to refrain from the actions that caused the contamination.

vi.   Whether Defendants made misleading representations or material omissions with respect to the health impacts of PFOA and PFOS.

vii.   Whether Defendants made misleading representations or material omissions with respect to the health impacts of their products.

viii.   For the Medical Monitoring Class, whether Plaintiff and Class Members were exposed to water containing elevated levels of PFOA and PFOS while living in the affected areas.

ix.   For the Property Damage Class, whether the PFOA and PFOS contamination caused and continues to cause:

(1) A continuous invasion of the property rights of the Plaintiff and Class such that their property values have and/or continue to decline in value following the disclosure of the PFC and other toxic chemical contamination; and

(2) Have substantially interfered with Plaintiff's and Class Members' use or enjoyment of their property.

x.   Whether Plaintiff and Class Members have suffered damages, and are entitled to an award of damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

xi.   Whether Defendants are liable to Plaintiff and the Class for their actions.

### Superiority

262.   The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Given the great number of individuals injured by Defendants' conduct, it is impracticable for Plaintiff and the Class to individually litigate their respective claims due to the risk of inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

### Plaintiff as his own Lexicographer

263.    Throughout this First Amended Complaint, "including" means "including, but not limited to."

264.    Throughout this First Amended Complaint, "chemicals" includes all elements, including chromium (further including hexavalent chromium) and arsenic.

## CONSPIRACY

265.    Defendants actually knew of the health and environmental hazards which PFOA and PFOS posed to Plaintiff and the Class.

266.    In addition to the facts alleged above, beginning in 1958 and continuing through the date of this First Amended Complaint, Defendants formed joint task forces and committees and otherwise colluded for the purpose of avoiding disclosure about the truly toxic nature of their conduct and/or products, including Maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's drinking water and poison her body.

267.    As a direct and proximate result of the Defendants' above described conspiracy, toxic chemicals, including PFOA and PFOS, at all times relevant to this litigation, have:

   i.    Posed and continues to pose a health threat to Plaintiff and the Class because they have bioaccumulated in their bodies;

   ii.   Will require testing and monitoring of Plaintiff's health for known adverse health effects;

   iii.  Contaminated Plaintiff's property, soil and groundwater, for those with private water wells;

   iv.   Will require remediation of contaminated groundwater for those property owners who utilize a private water wells, or, where remediation of the groundwater is impractical, installation of a system to filter out PFOA, PFOS, and other toxic chemicals, or procurement of water from alternative sources; and

   v.    Diminished, and will continue to diminish the values of Plaintiff and the Class's properties due to past, actual, impending or threatened contamination.

## V. Causes of Action for Class and Individual Claims

## As and for a First Cause of Action: NEGLIGENCE

268.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

269.    Defendants knew or should have known that exposure to toxic substances, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, are toxic to the environment and to human health.

270.    Defendants knew or should have known that the toxic chemicals that they were using, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, and the manner in which they were using, manufacturing, marketing, and selling products treated with or containing these chemicals, are toxic to human health, bioaccumulate in humans, and cause serious health effects, including cancer, thyroid failure, diabetes, high cholesterol, and other serious ailments.

271.    Defendants knew or should have known that PFC's are highly soluble in water, highly mobile, volatile, extremely persistent in the environment, and high likely to contaminate air- and water-supplies if released into the environment.

272.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, selling, and disposing of products containing or treated with toxic chemicals would result in the contamination of bodies of water including all manner of: lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further

including fish and deer) living in or on them, and further should have known that this

contamination would decrease values of affected and nearby property.

273.    Defendants owed a duty to Plaintiff and Class Members to act reasonably and not

place inherently dangerous products into the marketplace when their discharge into (and

subsequent mobility in) the ground and water was imminent and certain.

274.    Defendants knew or should have known that the use and/or discharge of toxic

chemicals into the ground, water, or sewer system was toxic to human health and the

environment, and required Defendants to take adequate measures to ensure that the toxic

chemicals were not released into the environment.

275.    Defendants knew or should have known that the use and/or discharge of toxic

chemicals into the ground, water, or sewer systems near the tannery, manufacturing facility, and

dump sites (including farmers' fields and all other disposal locations, further including the river,

its tributaries, and their banks), was unreasonably dangerous.

276.    Defendants owed a duty to Plaintiff and Class Members to develop, test,

manufacture, market, label, sell, use, and/or dispose of and maintain Scotchgard$^{TM}$ and products

containing Scotchgard, including waste and sludge, in a manner that would prevent and avoid

harm to those who use and/or are near it.

277.    Defendants owed a duty to Plaintiff and Class Members to use and/or dispose of

and maintain toxic chemicals, including waste and sludge, in a manner that would prevent and

avoid harm to those who use and/or are near it.

278.    Defendants had a duty to warn, instruct, and train their customers and personnel

on the safe and reasonable use, handling, and disposal, if any, of Scotchgard$^{TM}$ and all materials

treated with or otherwise containing toxic chemicals, including Scotchgard$^{TM}$ and/or PFC's, to

ensure that Plaintiff, Class Members, and the environment are not exposed to or contaminated by toxic chemicals.

279.    3M had a duty to ensure that the manufacturing processes it used did not contaminate with toxic chemicals the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them, that pertain to Plaintiff and Class Members.

280.    Wolverine had a duty to ensure that the manufacturing and waste disposal processes it used did not contaminate with toxic chemicals the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them, that pertain to Plaintiff and Class Members.

281.    Waste Management had a duty to ensure that the waste disposal processes it used did not contaminate with toxic chemicals the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them, that pertain to Plaintiff and Class Members.

282.    Defendants had a duty to take all reasonable steps to ensure that toxic chemicals, including PFC's and Scotchgard$^{TM}$ residue, would be effectively contained and not discharged into the surrounding environment.

283.    Defendants had a duty to maintain their toxic waste and dump sites.

284.    Defendants had a duty to disclose the toxic nature of the products and waste they were dumping and should have been maintaining.

285.    Defendants breached these duties by unreasonably disposing of materials containing toxic chemicals, including PFC's, in a manner that guaranteed they would enter the environment, including ground and water.

286.    Wolverine and Waste Management breached these duties by unreasonably disposing of materials containing additional toxic chemicals, including chromium (and further including hexavalent chromium), arsenic, copper, lead, mercury and zinc in a manner that guaranteed they would enter the environment, including ground and water.

287.    As a result of Defendants' breaches, the ground and water in and around disposal locations has become contaminated and unsafe for their intended and foreseeable uses.

288.    Defendants, through the negligent, reckless, and/or intentional acts and omissions alleged herein, have contaminated with toxic chemicals the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them, that pertain to Plaintiff and Class Members.

289.    Upon learning of the release of the toxic chemicals, Defendants owed Plaintiff and the Class a duty to warn and notify Plaintiff and the Class of the release of the contamination before it injured Plaintiff and the Class and their property and/or to act reasonably to minimize the damage to Plaintiff and the Class and their property, and to allow Plaintiff and the Class the opportunity to mitigate damages from these toxic chemicals.

290.    Defendants' failure to notify Plaintiff and the Class in a timely manner of the toxic chemicals' discharge and subsequent contamination of ground and water constitutes another breach of the duties that Defendants owed Plaintiff and the Class.

291.    This unsafe contamination has damaged, and continues to damage, Class Members by lessening the value of their property and forcing them to undertake expensive monitoring of their bodies and property and remediation efforts.

292.    If Defendants had not breached their duties, the damages to Class Members would not have occurred.

293.    The harm caused by Defendants' actions was reasonably foreseeable.

294.    As a direct and proximate result of Defendants' breaches of their duties, Plaintiff and Class Members were reasonably foreseeably harmed and suffered damages, including fear of toxic chemicals being unknowingly introduced to their bodies; loss of property value; loss of recreational amenities; monetary damages associated with monitoring and remediating contamination of their bodies and property.

295.    Accordingly, Plaintiff and the Class seek damages from Defendants, in an amount to be determined at trial, directly resulting from the injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiff and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants' conduct.

**As and For a SECOND Cause of Action: MEDICAL MONITORING**

296.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

297.    As a direct and proximate result of Defendants' intentional and negligent acts, as set forth above, Plaintiff and Class Members have been exposed to toxic  substances, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, in excess of normal background levels.

298.    As a result of this exposure, Plaintiff and Class Members are at heightened risk for a variety of ailments, including but not limited to:  cancer (further including kidney, testicular, liver, bladder, colon, prostate, rectal, pancreatic, breast, and skin cancer, multiple myeloma, leukemia, and Non-Hodgkin's Lymphoma), cardio- and cerebro-vascular disease, osteoarthritis, ulcerative colitis, liver disease, abnormal liver function, increased cholesterol, increased LDL cholesterol, lowered HDL cholesterol, auto-immune disorders, thyroid disorders and disease, compromised immune response and decreased immune response to vaccinations and accompanying diseases, pregnancy induced hypertension, developmental delays and disorders, and endocrine and metabolic diseases and disorders, including diabetes.

299.    Early diagnosis and treatment for the ailments listed above, caused by exposure to Defendants' toxic chemicals, is essential to mitigate negative long-term health consequences in Plaintiff and Class Members.

300.    Accordingly, Plaintiff and Class Members must undergo regular, expensive testing to mitigate the harm and damages being caused by Defendants.

301.    This testing is reasonably necessary and follows current medical practice.

302.    Much of this testing would not be required at all in the absence of exposure to Defendants' toxic chemicals.

303.    The rest of this testing is required more often than it would be in the absence of exposure to Defendants' toxic chemicals.

304.    Accordingly, Plaintiff and the Class seek damages from Defendants, in an amount to be determined at trial, for the costs of developing and conducting regular medical monitoring beyond what would be required in the absence of exposure to Defendants' toxic chemicals.

**As and for a THIRD Cause of Action: PRODUCTS LIABILITY –**

**FAILURE TO WARN**

305.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

306.    At all times relevant to this First Amended Complaint, Wolverine and 3M were in the business of designing, developing, engineering, manufacturing, refining, researching, testing, fabricating, selling, providing, and distributing Scotchgard$^{TM}$ and/or products made or treated with Scotchgard$^{TM}$.

307.    Wolverine and 3M knew or should have known that exposure to PFC's, including PFAS's, further including PFOA and PFOS, was toxic to the environment and to human health.

308.    Wolverine and 3M had a duty to provide reasonable instructions and adequate warnings about the risk of injury and hazardous nature of the product, as well as the harmful effects to human health and the environment posed by Scotchgard$^{TM}$ and those products.

309.    Wolverine and 3M knew or should have known that the distribution, storage, and use of Scotchgard$^{TM}$ or products made or treated with Scotchgard$^{TM}$ would contaminate the environment and enter the water supply, harming human health, property, and the environment.

310.    These risks were not obvious to consumers and/or end-users.

311.    Instead, Wolverine and 3M actively concealed these risks from Plaintiff and Class Members.

312.    Wolverine and 3M breached their duty by failing to provide adequate warning, or any warning at all, that use of their products could result in toxic chemicals entering the body and posing a substantial risk to human health.

313.    Wolverine and 3M breached their duty by failing to provide adequate warning, or any warning at all, that their products could result in contamination of the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them.

314.    Sufficient and adequate instructions or warnings would have greatly reduced or avoided the harms suffered by Plaintiff and Class Members as set forth in this First Amended Complaint.

315.    As a direct and proximate result of Wolverine's and 3M's wrongful actions in failing to provide adequate instructions or warnings for their products, Plaintiff and Class Members have suffered damages, in an amount to be determined at trial.

316.    As a result of Wolverine's and 3M's manufacture, sale and/or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff and Class Members.

317.    Wolverine's and 3M's acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and Class Members.

### As and for a FOURTH Cause of Action: PRODUCTS LIABILITY – DEFECTIVE DESIGN

318.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

319.    At all times relevant to this First Amended Complaint, Wolverine and 3M were in the business of designing, developing, engineering, manufacturing, refining, researching, testing,

fabricating, selling, providing, and distributing Scotchgard™ and/or products made or treated with Scotchgard™.

320.    Wolverine and 3M knew or should have known that exposure to PFC's, including PFAS's, further including PFOA and PFOS, was toxic to the environment and to human health.

321.    Wolverine and 3M had a duty to design their products in a way that would prevent human exposure to toxic chemicals and contamination of the environment.

322.    Wolverine and 3M breached that duty by, among other things, negligently and wrongfully designing, developing, engineering, manufacturing, refining, researching, testing, fabricating, selling, providing, and distributing Scotchgard™ and/or products made or treated with Scotchgard™, and thereby failing to exercise reasonable care to prevent toxic chemical components of those products from posing an unreasonable risk of harm to human health and the environment.

323.    It was reasonably foreseeable that the toxic chemicals present in the products that Wolverine and 3M designed, developed, engineered, manufactured, refined, researched, tested, fabricated, sold, provided, and distributed would contaminate the environment, including:  lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and municipal and private well drinking water supplies; including animals (further including fish) living in or on them.

324.    It was reasonably foreseeable that because of this environmental contamination, the toxic chemicals present in these products would thereafter enter the bodies of Plaintiff and Class Members.

325.    Because of this environmental contamination, the toxic chemicals present in these products did thereafter enter the bodies of Plaintiff and Class Members.

326. Alternative designs of Scotchgard™ and alternative water- and stain-resistant treatments were available, reasonable, technologically feasible, and practical, and would have greatly reduced or prevented the harms suffered by Plaintiff, Class Members, and the environment.

327. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property that was caused by Wolverine's and 3M's manufacture, marketing, and sale of Scotchgard™ and/or products made or treated with Scotchgard™.

328. Additionally, these products were so toxic and dangerous to human health and the environment, mobile, and persistent, that the act of designing, formulating, manufacturing, marketing, and selling these products was unreasonably dangerous under the circumstances.

329. These products of Wolverine and 3M were defectively designed, as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

330. These products of Wolverine and 3M were defective at the time of manufacture and at the time they left Wolverine's and 3M's control.

331. As a direct and proximate result of Wolverine's and 3M's defective design of their products, Plaintiff and Class Members suffered damages, in an amount to be determined at trial.

332. As a result of Wolverine's and 3M's design and formulation of defective products, Wolverine and 3M are strictly liable in damages to Plaintiff and Class Members.

333. Wolverine's and 3M's acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and Class Members.

**As and for a FIFTH Cause of Action:  Breach of Implied Warranty**

334.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

335.    Wolverine and 3M knew or should have known that exposure to PFC's, including PFAS's, further including PFOA and PFOS, was toxic to the environment and to human health.

336.    Wolverine and 3M knew or should have known that the manner in which they were manufacturing, marketing, and selling Scotchgard$^{TM}$ and/or products made or treated with Scotchgard$^{TM}$, containing PFC's, including PFAS's, further including PFOA and PFOS, was hazardous to human health and the environment.

337.    Wolverine and 3M knew or should have known that the manner in which they were manufacturing, marketing, and selling Scotchgard$^{TM}$ and/or products made or treated with Scotchgard$^{TM}$, containing PFC's, including PFAS's, further including PFOA and PFOS, would result in the contamination of Plaintiff's and Class Members' water supplies as a result of their proximity to the locations where Wolverine and Waste Management dumped, discharged, or caused to be discharged toxic substances, including Scotchgard$^{TM.}$

338.    Wolverine and 3M impliedly warranted that their PFC-containing products were of good and merchantable quality and fit for their intended use.  Wolverine and 3M knew or ought to have reasonably anticipated these products would be repeatedly and routinely discharged into the air, ground, and water.  Wolverine and 3M breached their implied warranty that these products were of good and merchantable quality and were fit for their particular intended use by causing Plaintiff's and Class Members' exposure to PFC's, which was a proximate and producing cause of Plaintiff's and Class Members' injuries.

**As and for a SIXTH Cause of Action: private nuisance**

339.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

340.    Plaintiff and the Property Damage Class, as described above, are owners of real property with the right of possession.

341.    Defendants, through their negligent, reckless, and/or intentional acts and omissions alleged herein, have contaminated with toxic chemicals the environment (including: lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and drinking water supplies; further including animals (including fish and deer) living in or on them) that pertains to Plaintiff and Class Members.

342.    In the operation of Wolverine's facilities in Kent County, the disposal of toxic waste therefrom, and failure to maintain these toxic disposals, Defendants used and generated toxic chemicals, such as PFC's, including PFAS, further including PFOS and PFOA.

343.    In the operation of Wolverine's facilities in Kent County, the disposal of toxic waste therefrom, and failure to maintain these toxic disposals, Defendants discharged odors, chemicals, and toxic substances into the air, ground, and water, and onto and into the property of Plaintiff and Class Members, causing damage to their real and personal property and health.

344.    Defendants had a duty to prevent the discharge of toxic chemicals onto Plaintiff's and Class Members' property, and to prevent the toxic chemicals from leaving the disposal sites and entering Plaintiff's and Class Members' property and drinking water.

345.    Plaintiff and Class Members did not consent for these toxic chemicals to physically invade their personal and real property.

346.    Plaintiff and Class Members have a right to the use and enjoyment of their property, including, but not limited to, their land (including for all types of gardening, both

inedible gardening and/or growing edible and/or organic fruits or vegetables) and any drinking water wells established on their properties.

347.    Defendants owed a duty to proceed with reasonable care to prevent Plaintiff's and Class Members' property from being contaminated with toxic chemicals.

348.    Defendants' wrongful actions in causing toxic chemicals to contaminate property and drinking water created a substantial interference with the use and enjoyment of, and physical harm to, the property of Plaintiff and Class Members.

349.    The contamination of Plaintiff's and Class Members' water and land with toxic chemicals has substantially interfered with the rights of Plaintiff and Class Members to use and enjoy their property.  This contamination has caused Plaintiff and Class Members to refrain from, *inter alia*, using their land for gardening (including all types of gardening, both inedible and/or growing edible and/or organic fruits or vegetables), and from using their water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense, anxiety, emotional distress, and diminution of property values.

350.    Defendants' conduct has also substantially interfered with Plaintiff's and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member decides.

351.    Defendants' negligent, reckless, and/or intentional acts and omissions and acts of interference with Plaintiff's and Class Members' use and enjoyment of their property were substantial and unreasonable.  This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

352.    Defendants' substantial and unreasonable interference with Plaintiff's and Class Members' use and enjoyment of their property constitute a nuisance for which Defendants are liable to Plaintiff and Class Members for all damages arising therefrom.

353.    As a direct and proximate result of Defendants' wrongful and intentional acts and omissions as alleged herein, Plaintiff and Class Members have incurred, and will continue to incur, costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective properties in an amount to be determined at trial, including emotional distress.

**As and for a SEVENTH Cause of Action: Public Nuisance**

354.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

355.    Plaintiff and Class Members, as members of the general public, have a right to safe drinking water and to live in an environment where toxic chemicals do not threaten their health or interfere with their use and enjoyment of public amenities, including lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and drinking water supplies; further including animals (further including fish and deer) living in or on them.

356.    Defendants have unreasonably interfered with the rights of Plaintiff and Class Members by causing the environment and areas in which Plaintiff and Class Members live and own property to become contaminated with toxic and dangerous chemicals, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc.

357.    Defendants' wrongful actions and inactions in causing this contamination have significantly interfered with the public's health, safety, peace, comfort, and convenience.

358.    Defendants knew, or should have known, that their wrongful conduct in repeatedly and systematically causing, contributing to, and exacerbating this contamination would and has produced a permanent and/or long-lasting infringement on public rights.

359.    Plaintiff's and Class Members' damages as a result of Defendants' conduct are of a special character and distinct from those suffered by the general public because Plaintiff and Class Members have actually been exposed to unsafe chemicals through consumption and/or absorption.

360.    Defendants, through the negligent, reckless, and/or intentional acts and omissions alleged herein, have contaminated with toxic chemicals the environment (including: lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and drinking water supplies; further including animals (including fish and deer) living in or on them) that pertains to Plaintiff and Class Members.

361.    In the operation of Wolverine's facilities in Kent County, the disposal of toxic waste therefrom, and failure to maintain these toxic disposals, Defendants used and generated toxic chemicals, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc.

362.    In the operation of Wolverine's facilities in Kent County, the disposal of toxic waste therefrom, and failure to maintain these toxic disposals, Defendants discharged odors, chemicals, and toxic substances into the air, ground, and water, and onto and into the property of Plaintiff and Class Members, causing damage to their real and personal property and health.

363.    These toxic substances are invasive and have caused damage to Plaintiff's and Class Members' personal and real property and health.

364.    Defendants had a duty to prevent the discharge of toxic chemicals onto Plaintiff's and Class Members' property, and to prevent the toxic chemicals from leaving the disposal sites and entering the environment, including Plaintiff's and Class members' property and water.

365.    Plaintiff and Class Members did not consent for these toxic chemicals to physically invade their personal and real property.

366.    Plaintiff and Class Members have a right to the use and enjoyment of their property, including, but not limited to, their land (including for all types of gardening, both inedible gardening and/or growing edible and/or organic fruits or vegetables) and any drinking water wells established on their properties.

367.    Defendants owed a duty to proceed with reasonable care to prevent Plaintiff's and Class Members' property from being contaminated with toxic chemicals.

368.    Defendants' wrongful actions in causing toxic chemicals to contaminate property and drinking water created a substantial interference with the use and enjoyment of, and physical harm to, the property of Plaintiff and Class Members.

369.    The contamination of Plaintiff's and Class Members' water and land with toxic chemicals has substantially interfered with the rights of Plaintiff and Class Members to use and enjoy their property.  This contamination has caused Plaintiff and Class Members to refrain from, *inter alia*, using their land for gardening (including all types of gardening, both inedible and/or growing edible and/or organic fruits or vegetables), and from using their water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense, anxiety, emotional distress, and diminution of property values.

370.    Defendants' conduct has also substantially interfered with Plaintiff's and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member decides.

371.    Defendants' negligent, reckless, and/or intentional acts and omissions and acts of interference with Plaintiff's and Class Members' use and enjoyment of their property were substantial and unreasonable.  This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

372.    Defendants' substantial and unreasonable interference with Plaintiff's and Class Members' use and enjoyment of their property constitute a nuisance for which Defendants are liable to Plaintiff and Class Members for all damages arising therefrom.

373.    As a direct and proximate result of Defendants' wrongful and intentional acts and omissions as alleged herein, Plaintiff and Class Members have incurred, and will continue to incur, costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective properties in an amount to be determined at trial, including emotional distress.

**As and for an EIGHTH Cause of Action:  Unjust Enrichment**

374.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

375.    Defendants knew or should have known that exposure to toxic substances, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, was hazardous to human health and the environment.

53

376.    Defendants knew or should have known that the use of toxic substances, such as PFC's, including PFAS, further including PFOS and PFOA; chromium (including hexavalent chromium); arsenic; copper; lead; mercury; and/or zinc, in in the manner in which they manufactured and marketed products, including waterproofing treatments, footwear, and other consumer goods, including leather goods, and/or the manner in which they disposed of waste and sludge from this manufacturing, was hazardous to human health and the environment.

377.    Defendants received numerous benefits from their failure to warn Plaintiff and Class Members about Defendants' culpable actions and inactions, from 3M's costs avoided by not having to recall its' toxic and dangerous products, and from Defendants' costs avoided by their failure to contain or remediate these toxic substances, waste, and sludge.

378.    Plaintiff and Class Members have suffered damages to their persons and property as a result of Defendants' manufacture, sale, and/or disposal of products, waste, or sludge containing these toxic substances

379.    Plaintiff and Class Members have conferred benefits upon Defendants by virtue of Defendants' profits and cost avoidance at the expense of Plaintiff and Class Members.

380.    Defendants have appreciated the benefits they received at Plaintiff's and the Class Members' expense.

381.    Under the circumstances, the Defendants' acceptance and retention of the benefits that they received without paying for the value of the benefits would be unjust and inequitable.

382.    Defendants wrongfully secured profits and avoided expenses related to the toxic substances that 3M sold to Wolverine and the disposal of waste resulting from those toxic substances, and it would be unconscionable for Defendants to retain those profits and the proceeds of those expenses avoided.

383.     Defendants have been unjustly enriched and have injured Plaintiff and Class Members.

**As and for a NINTH Cause of Action:  Fraudulent Concealment**

384.     Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

385.     Defendants knew of the harms, including environmental damage and health risks, posed by the toxic substances that 3M provided to Wolverine and of the toxic substances Wolverine and Waste Management disposed of.

386.     Nevertheless, Defendants intentionally concealed and failed to disclose to Plaintiff and Class Members the harmful nature of these toxic substances.

387.     Defendants knew or should have known that Plaintiff and Class Members would be exposed to these toxic substances.

388.     Defendants knew or should have known that the concealment would subject Plaintiff and Class Members additional exposure and damages, which would have been avoided if Defendants had not concealed the truth.

389.     Despite this, Defendants continued to affirmatively misrepresent the safety of Scotchgard$^{TM}$ and/or tannery and manufacturing waste, including sludge.

390.     Defendants also intentionally and wrongfully concealed their actions with regard to these toxic substances, including their failure properly to dispose of these toxic substances, and the toxic and hazardous nature of the waste itself, as well as of the sites they created and maintained where it was disposed of.

391.    If Plaintiff and Class Members had known of the material information intentionally concealed by Defendants, Plaintiff and Class Members would not have consented to being exposed to these toxic chemicals and would have taken steps to mitigate their losses.

392.    Plaintiff and Class Members reasonably believed that the ground and water in an around Wolverine's facilities, and the many sites where its waste was dumped, did not pose any health hazard.

393.    Plaintiff and Class Members had no reason to suspect they were being exposed to these toxic substances.  Contamination by these toxic substances did not alter the taste or appearance of the ground or water, and the resulting human ailments are not immediately apparent and do not always occur immediately.

394.    Plaintiff and Class Members, therefore, justifiably failed to discover their causes of action against Defendants until the recent publication of ground and water test results revealed Defendants' contamination.

395.    Defendants concealed the hazardous nature of their products and waste, which are fundamental and operative facts that form the basis of the causes of action alleged in this First Amended Complaint.

396.    At all times, Plaintiff and Class Members exercised reasonable diligence in discovering and prosecuting their claims.

**As and for a TENTH Cause of Action:  Intentional Infliction of Emotional Distress**

397.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

398.    Defendants knowingly produced, used, and/or improper transport and disposal of toxic substances to various locations in Michigan, primarily but not exclusively in Kent County,

contaminating the environment and poisoning Plaintiff and Members of the Medical Monitoring Class.

399. Defendants made no attempt to mitigate or remediate the contamination or its migration, or to warn Plaintiff or Members of the Medical Monitoring Class of the dangers lurking in the land and water, but instead, actively concealed their wrongful actions and inactions and the dangers of the toxic substances that they had dumped there.

400. Only through state and local government investigation were Plaintiff or Members of the Medical Monitoring Class finally informed of the presence of these toxic contaminants. If Defendants had notified Plaintiff or Members of the Medical Monitoring Class earlier, they would have limited their exposure to these toxic contaminants in the water and ground.

401. Defendants' conduct in poisoning Plaintiff and Members of the Medical Monitoring Class, and then hiding it from them, is extreme and outrageous.

402. Defendants acted with intent, and at the very least recklessness, with regard to the health and safety of Plaintiff and Members of the Medical Monitoring Class.

403. Defendants' conduct has caused severe emotional distress among Plaintiff and Members of the Medical Monitoring Class, who now live in fear of imminent and severe ailments in themselves and their immediate families, including incurable and rapidly fatal diseases, such as pancreatic, kidney, and liver cancer, and also other cancers (further including testicular, bladder, colon, prostate, rectal, breast, and skin cancer, multiple myeloma, leukemia, and Non-Hodgkin's Lymphoma), cardio- and cerebro-vascular disease, osteoarthritis, ulcerative colitis, liver disease, abnormal liver function, increased cholesterol, increased LDL cholesterol, lowered HDL cholesterol, auto-immune disorders, thyroid disorders and disease, compromised immune response and decreased immune response to vaccinations and accompanying diseases,

pregnancy induced hypertension, developmental delays and disorders, and endocrine and metabolic diseases and disorders, including diabetes.

## VI. Claim for Punitive Damages

404.    Plaintiff hereby repeats, re-alleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

405.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and injuries upon the persons and properties of Plaintiff and Class Members, disregarding their rights.

406.    Defendants' willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, Defendants' failure to take reasonable measures to ensure its toxic substances, which they knew to be carcinogenic and/or very harmful, were not ingested by Plaintiff or Class Members.

1.    Defendants have caused great harm to the property and water supplies of Plaintiff and Class Members and demonstrated an outrageous, conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## VII. Prayer for relief

WHEREFORE, Plaintiff and Class Members demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.    an award certifying the Classes;

B.    a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiff and Class Members;

C.      an order requiring that Defendants implement a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Property Damage Class;

D.      an order requiring Defendants to implement remedial measures to prevent further contamination of the persons and property of Plaintiff and Class Members by toxic substances;

E.      an order requiring disgorgement of profits wrongfully and/or inequitably retained;

F.      an order requiring restitution of Plaintiff and Class Members to the situation they would have been in without Defendants' misconduct;

G.      a surcharge;

H.      an order establishing a medical monitoring protocol for Plaintiff and Members of the Medical Monitoring Class;

I.      an award to Plaintiff and Class Members of general, compensatory, exemplary, consequential, nominal, and punitive damages;

J.      an order for an award of attorney fees and costs, as provided by law;

K.      an award of pre-judgment and post-judgment interest as provided by law; and

L.      an order for all such other relief the Court deems just and proper.


## VIII. JURY DEMAND

Plaintiff hereby demands a trial by jury of any and all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Date: March 4, 2019

Respectfully submitted,

**NAPOLI SHKOLNIK, LLC**

**By:** /s/ R. Joseph Hrubiec, Esq.

R. JOSEPH HRUBIEC
DE BAR ID NO. 5500
919 North Market Street, Suite 1801
Wilmington, DE  19801
T: (212) 397-1000
E-mail: rhrubiec@napolilaw.com

PAUL J. NAPOLI (P/H/V)
TATE KUNKLE (P/H/V)
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
T: (212) 397-1000
E-mail: tkunkle@napolilaw.com
pnapoli@napolilaw.com

*Lead Counsel for Plaintiff and the Putative
Class*